**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-00305-NYW-SBP

AUBREE PACHECO,

> Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

> Defendant.

---

## ORDER ON MOTION TO EXCLUDE

---

This matter is before the Court on Defendant's Opposed Fed. R. Evid. 702 Motion to Exclude Opinions of Plaintiff's Retained Expert Brian Seigal (the "Motion" or "Motion to Exclude"). [Doc. 34]. The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not assist in the resolution of the Motion. In addition, no Party has requested an evidentiary hearing on the Motion. For the reasons set forth in this Order, the Motion to Exclude is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

On March 15, 2017, Plaintiff Aubree Pacheco ("Plaintiff" or "Ms. Pacheco") was involved in a motor vehicle collision in Denver, Colorado, and suffered injuries as a result. [Doc. 5 at ¶¶ 5, 13, 20–25]. Ms. Pacheco settled with the at-fault driver's insurance company for $100,000. [*Id.* at ¶¶ 27–29]. Thereafter, she tendered a demand for underinsured motorist ("UIM") benefits on her insurance company, Defendant State Farm Mutual Automobile Insurance Company ("Defendant" or "State Farm"), as her "combined

harms, losses, and damages equaled or exceeded $200,000, the amount of the settlement" with the tortfeasor and "the limits of Ms. Pacheco's underinsured motorist benefits" under her insurance policy.  [*Id.* at ¶ 30].  State Farm has not paid any UIM benefits to Ms. Pacheco.  [*Id.* at ¶ 58].

Plaintiff initiated this action on December 30, 2022, asserting three claims against Defendant:  (1) breach of contract; (2) bad faith breach of insurance contract; and (3) unreasonable delay or denial under Colo. Rev. Stat. §§ 10-3-1115 and 1116.  [*Id.* at ¶¶ 59–82].  During discovery, Plaintiff disclosed Brian Seigal ("Mr. Seigal") as an "insurance expert."  [Doc. 34-1 at 1]; *see also* [Doc. 34-2 (Mr. Seigal's report)].  On December 20, 2023, State Farm moved under Rule 702 to exclude Mr. Seigal's testimony.  *See* [Doc. 34].  It first contends that Mr. Seigal is not qualified to opine about insurance industry standards or State Farm's handling of Plaintiff's insurance claim in this case, such that the entirety of his testimony should be excluded.  [*Id.* at 4–6].  In the alternative, it challenges certain specific opinions of his, arguing that they are either unreliable, unhelpful to the jury, or irrelevant.  [*Id.* at 6–15].  The Motion is fully briefed, *see* [Doc. 36; Doc. 41], and is ripe for resolution.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "In essence, Rule 702 permits a court to admit expert testimony that is 'both reliable and relevant.'"  *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).  The party proffering expert testimony has the burden of showing its admissibility by a preponderance of the evidence.  *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1048 (D. Colo. 2011).

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony is reliable and relevant.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993).  To fulfill that gatekeeper function, the trial court first analyzes whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render their opinions.  Fed. R. Evid. 702; *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019).  If the expert is so qualified, the trial court must determine whether the expert's opinions are reliable by assessing the underlying reasoning and methodology.  *Bill Barrett Corp.*, 918 F.3d at 770.  "Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's particular expertise, and the subject of the testimony.'"  *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 148–50).  And finally, the court must determine whether the expert's opinions are "applicable to a particular set of facts," i.e., are relevant to the case at hand.  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).  This inquiry "encompasses Rule 702's requirement that the evidence help the trier of fact to

understand the evidence or to determine a fact in issue."  *Sanderson*, 976 F.3d at 1172

(cleaned up).

## ANALYSIS

### I.    Mr. Seigal's Qualifications

First, State Farm moves to exclude the entirety of Mr. Seigal's testimony on the

basis that he is not qualified to offer opinions about Ms. Pacheco's claims in this case.

[Doc. 34 at 4–5].  State Farm argues that Mr. Seigal lacks the requisite qualifications

because despite the "considerable period of time" he has worked in the insurance

industry, he "has never adjusted a bodily injury or underinsured/uninsured motorist claim."

[*Id.* at 5].  It also contends that the "last time Mr. Seigal dealt with any claim that might

arguably have involved the same subject matter as in this current case" was in 2003,

before the statute underlying Plaintiff's statutory bad faith claim existed, such that he lacks

knowledge about this "new statutory scheme and supporting case law."  [*Id*. at 5–6].

Plaintiff responds that Mr. Seigal is qualified to opine on insurance industry

standards with respect to her claims because he has 29 years of experience in the

insurance industry, and that this experience involves working as a claims adjuster over

both first- and third-party claims, "including . . . UIM claims," and supervising claims

departments that handle first- and third-party claims, including UIM claims.  [Doc. 36 at

3–4].  She further argues that Mr. Seigal has "conduct[ed] forensic analysis of hundreds

of UM/UIM claims in Colorado."  [*Id*. at 4].  Finally, she represents that Mr. Seigal has

"obtained his [Associates in Claims ("AIC")] designation, which included specialized

education and training in the claims handling process [and] duties of good faith and fair

dealing that insurers owe their insureds."  [*Id*.].

"Under Rule 702, an expert's qualifications may derive from knowledge, skill, experience, training, or education." *Gould v. Union Pac. R.R. Co.*, No. 19-cv-02326-PAB-NRN, 2021 WL 4428286, at *3 (D. Colo. Sept. 27, 2021). "[B]eyond formal education, both the language of Rule 702 and Tenth Circuit precedent make clear that the 'specialized knowledge' required for expert testimony 'can be acquired through "experience" and "training."'" *Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-cv-03206-WJM-KMT, 2016 WL 8608447, at *3 (D. Colo. Sept. 12, 2016) (quoting *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)). "Rule 702 does not impose an 'overly rigorous' requirement of expertise, recognizing that specialized knowledge may be acquired through a broad range of experience, skills or training." *Squires*, 829 F. Supp. 2d at 1048 (quoting *United States v. Velasquez*, 64 F.3d 844, 849 (3rd Cir. 1995)). A court "should not exclude expert testimony simply because the court feels that the proffered witness is not the *most* qualified or does not have the specialization considered *most* appropriate by the court." *Id.* (emphasis added).

According to Mr. Seigal's curriculum vitae, he began working in the insurance industry in 1995 as a "Senior Adjuster and Team Manager" for property and casualty claims. [Doc. 34-4 at 1]. After eight years in that position, he then became a "Lead Supervisor and Claim Manager" for workers' compensation, asbestos, and construction defect claims. [*Id.*]. His additional years of experience are similarly related to workers' compensation and health insurance; he held two different supervisory positions, one in which he was "[r]esponsible for claims processes [and] procedures" and the other in which he oversaw a team that "processed and audited 70,000 claims per month." [*Id.*].

In addition, Mr. Seigal's expert report states that he has "managed and been responsible for the training of hundreds of adjusters . . . spanning multiple lines of business including Liability."  [Doc. 34-2 at 2].  He represents that his "experiences have spanned the investigation, evaluation, settlement, litigation management, and resolution phases of claims for first-party and third[-]party claims" and that he has reviewed and audited "thousands" of claim files "from 50+ claims departments" to assess whether certain standards were followed.  [*Id.*].  He also represents that he is familiar with "claim-related standards, customs, practices, and procedures" with respect to liability insurance, and that he "understand[s] the applicable standards of care and practice for . . . bodily injury and uninsured/ underinsured [sic] motorist coverage."  [*Id.*].  Finally, Mr. Seigal states that he has "evaluated more than 350+ first-party and third-party" insurance claims, including "auto claims."  [*Id.* at 3].

The Court finds that, although somewhat of a close call, it is "more likely than not," *see* Fed. R. Evid. 702, that Mr. Seigal's specialized knowledge will help the trier of fact in this case.  To be sure, Mr. Seigal's experience in the insurance industry is not limited to or highly concentrated in automobile liability insurance or UIM coverage or in handling those claims.   Rather, his experience appears focused in the areas of workers' compensation and health insurance.  *See* [Doc. 34-4 at 1].  However, "[t]o be qualified, an expert need not have any certain profession," *Mathison v. Wilson*, No. 14-cv-03345-RM-KLM, 2017 WL 4227243, at *2 (D. Colo. Mar. 21, 2017), and the fact that Mr. Seigal has not personally handled UIM claims "is not dispositive of his qualifications to testify about the insurance industry," *Stoker v. State Farm Mut. Auto. Ins. Co.*, No. 19-cv-03569-NYW, 2021 WL 4201583, at *4 (D. Colo. May 6, 2021) (this Court concluding that an

expert was qualified based on his familiarity and knowledge of insurance industry standards, despite lack of personal experience adjusting claims). Mr. Seigal represents that his time in the insurance industry has involved managing practically every step in the claims-handling process, including liability insurance claims, and his experience supervising claims handling practices and reviewing thousands of claims files to review whether standard practices were followed cannot be ignored. *See id.* at *7 (the expert's lack of experience in claims handling did not render him unqualified due to, inter alia, his experience reviewing and supervising "several thousand" claim files). While Mr. Seigal's hands-on experience may involve a different type of insurance, the Court is not persuaded that this automatically precludes him from having specialized knowledge—based on his decades-long experience in the insurance industry—about standards governing claims-handling in the UIM context. *Cf. Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-cv-00439-MCA-LF, 2017 WL 4410780, at *5 (D.N.M. Sept. 30, 2017) (finding expert qualified in automobile liability case where the expert "ha[d] been continuously involved with the insurance industry, including claims handling, albeit in the medical malpractice arena").

Indeed, Mr. Seigal represents that he is familiar with the applicable standards of care for UIM claims, [Doc. 34-2 at 2], and his report reflects that familiarity, *see, e.g.*, [*id.* at 32–37]; *see also O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 924 (D. Colo. 2017) (in concluding that expert was qualified, noting that the expert's "report reflect[ed] familiarity with the standards and practices used by his former employer, with standards published by industry bodies, and with statutory law that insurers in Colorado must follow" and that his opinions "plainly [arose] from that experience"). And while it is not dispositive of Mr. Seigal's qualifications in *this* case, *Squires*, 829 F. Supp. 2d at 1049, the Court

notes that another court in this District recently concluded that Mr. Seigal's "significant training and 29 years of experience in the insurance industry," including experience handling claims "in a variety of areas, including auto liability coverage," rendered him qualified to offer opinions in a UIM case. *See Sanchez v. USAA Cas. Ins. Co.*, No. 22-cv-01694-REB-STV, ECF No. 149 at 5 (D. Colo. June 27, 2024).

The question before the Court is not whether Mr. Seigal is the "most qualified" to offer opinions about insurance industry standards, but whether he is sufficiently qualified to offer opinions that will assist the jury in evaluating Plaintiff's claims. *Squires*, 829 F. Supp. 2d at 1048; *O'Sullivan*, 233 F. Supp. 3d at 924. The Court is satisfied that Mr. Seigal "has far more specialized knowledge of insurance industry practices and standards than does a typical juror, and finds this specialized knowledge will be helpful to the trier of fact." *O'Sullivan*, 233 F. Supp. 3d at 924. Of course, any perceived lack of experience of directly handling UIM claims by Mr. Siegal can be brought to the jury's attention on cross-examination. *Id.* Accordingly, the Court declines to preclude Mr. Seigal's testimony based on insufficient qualifications.

## II.    Reliability

Next, Defendant argues that Mr. Seigal "has not reliably applied the principles or methodology of a claims handling expert to form his opinions in this matter and these opinions should be excluded as unreliable and irrelevant." [Doc. 34 at 6 (emphasis omitted)]. Specifically, Defendant challenges five opinions contained in Mr. Seigal's report:

- Mr. Seigal's "opinions regarding the tools used in State Farm's evaluation of Plaintiff's claim," including that "other than sending some letters to medical providers and asking for Ms. Pacheco to provide [State Farm] with medical records and litigation materials, none of the [investigative tools listed by Mr. Seigal] were

considered or used to investigate Ms. Pacheco's UIM claims pre[-]suit."  [*Id.* at 8 (quoting [Doc. 34-2 at 28–29])].

- Mr. Seigal's opinion that "[State Farm]'s pre-suit investigative efforts were minimal. They asked Ms. Pacheco for documents, signed releases and medical records. Post-suit, [State Farm] scheduled a medical exam and a deposition.  While[] these post-suit efforts are important, they typically occur pre-suit before the evaluation is completed."  [*Id.* at 9 (quoting [Doc. 34-2 at 33])].

- Mr. Seigal's opinion that "[State Farm]'s inactions resulted in them under[-]valuating the claim.  It seems intentionally designed to create the foundation for a value dispute."  [*Id.* (quoting [Doc. 34-2 at 33])].

- Mr. Seigal's opinion that "[t]he typical UIM claim process utilized within the industry was not followed pre-suit by [State Farm]."  [*Id.* (quoting [Doc. 34-2 at 37])].

- Mr. Seigal's opinion that "[State Farm] has not taken fair positions during the investigation and claim evaluation phases of the case (they did not conduct a thorough investigation, disregarded the communications of their insured (relating to mistakes in prior testimony and the status of past medical treatment), ignored key damage elements, made arbitrary evaluations for settlement purposes, did not investigate the nature of the crash, consult bio mechanical engineers to investigate possible medical damages collisions like this one[)]."  [*Id.* at 10 (quoting [Doc. 34-2 at 61])].

Defendant attacks these opinions[1] on a number of bases, arguing that (1) these opinions are speculative *ipse dixit* opinions, [*id.* at 6–7]; (2) Mr. Seigal relies upon unreliable texts from the Institutes for Associates in Claims to form his opinions, and there is no indication that others in the insurance industry rely on these AIC texts to determine industry standards, [*id.* at 7–8]; and (3) these opinions offered lack an adequate foundation and are speculative, [*id.* at 9–10].

---

[1] The undersigned's Uniform Civil Practice Standards require that a party seeking to exclude expert testimony under Rule 702 must "specify, with particularity, the opinion(s) that the moving party seeks to exclude and the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency, or methodology."  NYW Civ. Practice Standard 7.1C(b).  Accordingly, the Court limits its analysis to the opinions clearly identified and challenged in Defendant's Motion.

In her Response, Ms. Pacheco states that "[e]ven a cursory reading of Mr. Seigal's 76-page report plus fifty-five indices,[2] in this case will demonstrate that it is among the most well-documented expert reports ever offered in a UIM bad faith case."  [Doc. 36 at 9].  She defends Mr. Seigal's use of the AIC texts to formulate his opinions, *see* [*id.* at 8], but offers no further defense of the specific opinions challenged by State Farm, *see generally* [*id.*].[3]

Expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590.  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Mooring Cap. Fund, LLC v. Phoenix Cent., Inc.*, No. 5:06-cv-00006-HE, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009) ("[A]n expert's opinions are not admissible merely because the expert says, in effect, 'trust me, I know.'").  "[C]onclusory opinions, which require blind acceptance of the expert's *ipse dixit*, are never helpful."  *Huang v. Marklyn Grp. Inc.*, No. 11-cv-01765-REB-BNB, 2014 WL 3559367, at *5 (D. Colo. July 18, 2014).  With these principles in mind, the Court turns to the challenged opinions.

---

[2] Neither Party has provided the Court with a copy of any "indices" or the appendices mentioned in Mr. Seigal's report.

[3] To the extent Plaintiff says that Chief Judge Brimmer's decision in *Thompson v. State Farm Mutual Automobile Insurance Co.*, 457 F. Supp. 3d 998 (D. Colo. 2020), "provided a current and excellent summary of Colorado's law regarding an insurance company's duty to investigate in Colorado," [Doc. 36 at 10], she fails to tie this in any way to the opinions challenged by State Farm and the Court does not consider this argument in assessing those opinions.

1. *Mr. Seigal's "opinions regarding the tools used in State Farm's evaluation of Plaintiff's claim," including that "other than sending some letters to medical providers and asking for Ms. Pacheco to provide [State Farm] with medical records and litigation materials, none of the tools outlined in this section were considered or used to investigate Ms. Pacheco's UIM claims pre[-]suit."*

This statement was made in the context of Mr. Seigal's opinion concerning "SF Unused [sic] Investigative Tools before the denial was issued on December 21, 2021." [Doc. 34-2 at 27].  Mr. Seigal states in his report that it is an insurance industry standard to investigate a claim "thoroughly, promptly, and fairly" and opines that insurers like State Farm are "familiar with the broad range of investigative tools they can utilize to meet their investigative duties."   [*Id.*].   On the next page, he identifies nine such "tools"—bio-mechanical analysis, accident reconstruction, mechanical evaluators, recorded statements, examinations under oath, witness statements about the crash, witness statements about the impact of the crash on the insured, telephone calls to medical providers, and independent medical examinations—and states that "[t]here is no claim file documentation supporting that these tools were considered pre-suit to investigate the crash."  [*Id.* at 28].  He further explains that "[t]here is not an industry standard to use all these tools," but "it is the standard of the industry to utilize some tools to investigate the claimed damages of the first-party insureds (thoroughly, promptly, and fairly)."  [*Id.*].  He then states, as recounted above, that State Farm did not utilize these tools.  [*Id.* at 28–29].

State Farm argues that these opinions are "wholly unreliable" because "[c]ourts in this Circuit have determined that insurers can rely on a plaintiff's medical records when evaluating a claim" and "courts in Colorado have held that it would not be reasonable for insurers to look for evidence of damage that is not present in an insured's submitted

medical records." [Doc. 34 at 8–9 (citations omitted)]. These arguments are essentially counterarguments concerning the reasonableness of State Farm's conduct, not arguments attacking the reliability of Mr. Seigal's opinion; in the Rule 702 analysis, the Court's focus is on reliability, not correctness. *See Gould*, 2021 WL 4428286, at *2. Nevertheless, the Court agrees with State Farm that Plaintiff has not demonstrated the reliability of most of this opinion.

An insurance industry expert's methodology has been deemed reliable when the expert "explains what he knew of insurance industry standards and practices based on his experience, explains the facts and evidence he reviewed in the case," and opines on how the insurer's handling of the plaintiff's claim "fell short of the relevant industry standards or differed from handling of similar claims in his experience." *George v. Metro. Prop. & Cas. Ins. Co.*, No. 18-cv-01663-PAB-SKC, 2020 WL 70424, at *13 (D. Colo. Jan. 2, 2020) (quoting *O'Sullivan*, 233 F. Supp. 3d at 925) (cleaned up). While Mr. Seigal dedicates several pages to setting out what he believes are applicable industry standards, *see* [Doc. 34-2 at 36–51], for most of the "tools" he identifies, he fails to explain the basis for his opinion that it is standard insurance industry practice to use them, *see generally* [*id.*]. In fact, some of the "tools" are not mentioned otherwise in the report at all.

Mr. Seigal does, however, explain that independent medical examiners are "often called on to conduct an independent evaluation to help resolve a medical dispute," [Doc. 32-4 at 44], and that independent medical examinations are "one of the most effective strategies for managing claims," [*id.* at 51].[4] Each of these statements is accompanied

---

[4] The Court notes that Mr. Seigal takes these industry standards from AIC texts based on the workers' compensation industry. *See* [Doc. 34-2 at 44, 51]. But Mr. Seigal acknowledges this, stating that "[w]hile this is not a workers' compensation case, the [text]

by a source for Mr. Seigal's position that it is industry standard to rely on independent medical examinations in evaluating claims. [*Id.* at 44, 51]. In this regard, the Court is satisfied that Mr. Seigal has adequately explained the applicable standard and why, applying that standard to the facts of this case, State Farm failed to comply with that standard.

The Court will **EXCLUDE** Mr. Seigal's opinions regarding the "tools" State Farm could have, but did not, use as unreliable, **except with respect to independent medical examiners or independent medical examinations**, which Mr. Seigal will be permitted to opine about at trial.

> *2. "[State Farm]'s pre-suit investigative efforts were minimal. They asked Ms. Pacheco for documents, signed releases and medical records. Post-suit, [State Farm] scheduled a medical exam and a deposition. While[] these post-suit efforts are important, they typically occur pre-suit before the evaluation is completed."*

State Farm argues that this opinion should be excluded because it lacks foundation and is nothing more than Mr. Seigal's *ipse dixit*. [Doc. 34 at 9]. Plaintiff does not defend this specific opinion. *See* [Doc. 36 at 8–10]. As mentioned above, Mr. Seigal does adequately explain, in the Court's view, the applicable industry standards regarding obtaining an independent medical examination and why he believes State Farm violated that standard by denying Ms. Pacheco's claim without an examination and waiting until after she filed her lawsuit to obtain the examination. *See* [Doc. 34-2 at 44, 51, 62]; *see also* [*id.* at 69 (noting that State Farm noted on June 3, 2021 "that they may need an IME"); *id.* at 70 (State Farm "denied the UIM claim without conducting a full investigation

---

translates properly to first-party auto claims industry standards. [*Id.* at 51]. State Farm does not argue that the opinion is improper on this basis, and the Court does not sua sponte take issue with it.

including an IME")].  However, the Court can discern nothing in Mr. Seigal's report that explains the basis for his opinion that it is standard in the industry to depose the insured prior to any litigation, and Plaintiff directs the Court to no support for this opinion. Accordingly, the Court will **EXCLUDE** this opinion only to the extent Mr. Seigal opines that a deposition "typically occur[s] pre-suit before the evaluation is completed."

### 3.  *"[State Farm]'s inactions resulted in them under[-]valuating the claim.  It seems intentionally designed to create the foundation for a value dispute."*

Mr. Seigal states in his report that State Farm conducted only a "minimal" pre-suit investigation and offered Plaintiff a "low-ball offer of $1,000 to resolve this matter."  [*Id.* at 33].  He explains that "[w]hen a carrier does not take the initiative to promptly or thoroughly investigate the extent of their insured's damages, by not asking questions, engaging witnesses, or discussing their insured's experience with their insured, the carrier creates an environment where they are unable to accurately evaluate the extent of damages." [*Id.*].  He concludes that State Farm's actions resulted in an under-valuation of the claim, which he opines "seems intentionally designed to create the foundation for a value dispute."  [*Id.*].  State Farm seeks to exclude this opinion as lacking in foundation.  [Doc. 34 at 9].  Plaintiff does not defend this opinion.  *See* [Doc. 36].

The Court agrees with State Farm that Mr. Seigal does not adequately explain the source or basis of this opinion or explain how he formed his opinion that State Farm's actions "seem[]" designed to create a value dispute.  *See generally* [Doc. 34-2].  This opinion requires "blind acceptance of [Mr. Seigal's] *ipse dixit*" and is thus unhelpful to the jury.  *Huang*, 2014 WL 3559367, at *5.  The Court will therefore **EXCLUDE** this opinion.

*4.  "The typical UIM claim process utilized within the industry was not followed pre-suit by [State Farm]."*

Again, State Farm seeks to exclude this opinion on the basis that it lacks foundation and is supported only by Mr. Seigal's personal beliefs.  [Doc. 34 at 9].  The Court respectfully disagrees with this assessment.  This broad statement is a summation of Mr. Seigal's view of State Farm's pre-suit conduct in this case.  Mr. Seigal's report sets out industry standards and case-specific facts supporting this opinion, *see, e.g.*, [Doc. 34-2 at 26, 33, 35–36, 43–46, 70–71], and the Court finds this opinion adequately supported when considering the report as a whole.  *Cf. Domokos v. Shelter Mut. Ins. Co.*, No. 18-cv-00903-WJM-NRN, 2020 WL 869854, at *5 (D. Colo. Feb. 21, 2020) (where an expert sets out relevant standards at the beginning of his report, he is "not required to repeat all of this again" before giving each opinion).  The Court will not exclude this opinion.

*5.  "[State Farm] has not taken fair positions during the investigation and claim evaluation phases of the case (they did not conduct a thorough investigation, disregarded the communications of their insured (relating to mistakes in prior testimony and the status of past medical treatment), ignored key damage elements, made arbitrary evaluations for settlement purposes, did not investigate the nature of the crash, [or] consult bio mechanical engineers to investigate possible medical damages collisions like this one[)]."*

Finally, State Farm moves to exclude the above opinion.  It argues not only that this opinion lacks foundation, [Doc. 34 at 9], but it further contends that "Mr. Seigal's opinions regarding 'fair' investigation are reliant upon the outdated AIC textbooks, which have not been established as reliable methodology related to claim handling in Colorado," [*id.* at 10].

The Court addresses State Farm's second argument first, construing it as an assertion that Mr. Seigal's methodology lacks the support of "sufficient facts or data."  *See* Fed. R. Evid. 702(b).  In response to this argument, Ms. Pacheco directs the Court to Mr.

Seigal's report, wherein he says that the Institutes are "a leading provider of risk management and insurance education and resources." [Doc. 36 at 8 (quoting [Doc. 34-2 at 38])]. She also asserts that the Institutes "continue[] to rely on these [AIC] texts in describing accurate and current insurance industry standards," [*id.* at 9], though she cites nothing in support of this statement. For his part, Mr. Seigal states in his expert report that,

> [t]o explain applicable industry norms and standards, I am referencing applicable sections from four claims handling textbooks which have been utilized by The Institutes for the AIC (Associates in Claims) designation. . . . The Institutes was formed by a group of insurance leaders to provide knowledge and resources to those interested in property-casualty insurance. It is a leading provider of risk management and insurance education and resources.[] These texts have been used across the nation and over many years. I am citing these texts: *Claim Handling Principles and Practices*, *The Claims Environment*, *Auto Claim Practices, Managing Bodily Injury Claims*, and *Principles of Workers Compensation Claims*.

[Doc. 34-2 at 38]. According to Mr. Seigal, the AIC texts contain "common and well understood practices" in the industry. [*Id.* at 35 n.1]. Mr. Seigal also represents that "these materials directly relate to the types of industry norms and standards that claims organizations adhere to in the day-to-day practice of good faith and fair claims handling for first-party claims." [*Id.* at 38]. He then spends 14 pages setting out claims handling principles, practices, and standards identified in the AIC texts that he finds relevant to this case. [*Id.* at 38–51].

Based on Mr. Seigal's representations in his report, the Court declines to exclude this opinion on this basis. While insurance industry experts most often rely on their experience to articulate industry standards, *see, e.g.*, *O'Sullivan*, 233 F. Supp. 3d at 928, Mr. Seigal here references the AIC texts as "[s]ources for industry [s]tandards for insurer conduct," [Doc. 34-2 at 6]; *see also* [*id.* at 38 ("To explain applicable industry norms and

standards, I am referencing applicable sections from four claims handling textbooks which have been utilized by The Institutes for the AIC (Associates in Claims) designation.")]. Mr. Seigal represents that the standards set forth in the AIC texts are representative of common and well-understood insurance industry practices relevant to this case and that the AIC texts "have been used across the nation and over many years."  [*Id.* at 35 n.1, 38].

An expert witness's "endorsement of their own methodology typically will provide *prima facie* evidence sufficient to satisfy the proponent's burden of showing a reliable methodology," which must be demonstrated by a preponderance of the evidence.  *Duke Univ. v. Sandoz, Inc.*, No. 18-cv-00997-MSK-KLM, 2021 WL 8153738, at *2 n.1 (D. Colo. Sept. 7, 2021); *see also Squires*, 829 F. Supp. 2d at 1048.  "Competing evidence—not just argument—will typically be necessary for the movant to refute this evidence."  *Duke Univ.*, 2021 WL 8153738, at *2 n.1.  Here, State Farm offers no *evidence* showing the unreliability of the AIC texts or calling into question Mr. Seigal's reliance on them, such as an affidavit from a competing expert explaining that these texts are not commonly used in the industry.  And the Court is not in any position to independently conclude that the AIC texts are unreliable sources of data over Mr. Seigal's representation that these texts are commonly used.  *Cf. Mills v. FCA US, LLC*, No. 18-cv-01891-MSK-STV, 2021 WL 4079363, at *15 (D. Colo. Sept. 7, 2021) (denying motion to exclude where the movant offered no support for its attack on the expert's methodology and instead appeared to argue that "the defects in [the expert's] methodology are so self-evident that the Court should deem them unreliable simply based on the Court's own sense of reasonableness").

The Court's inquiry at this stage "examines only whether the witness obtained the amount of data that the methodology itself demands." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008). Given that it is typical for insurance industry experts to rely on their own experience in articulating insurance industry standards, and given Mr. Seigal's representations in his report that (1) "[b]ased on [his] education, training, and experience, [he] understand[s] the applicable standards of care and practice" for UIM claims, [Doc. 34-2 at 2], and (2) the AIC texts "directly relate to the types of industry norms and standards that claims organizations adhere to in the day-to-day practice of good faith and fair claims handling for first-party claims," [*id.* at 38], the Court perceives no basis to exclude Mr. Seigal's opinion as unreliable because it depends in part on the AIC texts.

State Farm also argues that this opinion lacks foundation. [Doc. 34 at 9]. But the Court is satisfied that, with respect to this opinion—which is a summary of his overarching views on State Farm's conduct—Mr. Seigal identified the facts he relied on and explained why he believes State Farm fell short of various industry standards. *George*, 2020 WL 70424, at *13; *see also, e.g.*, [Doc. 34-2 at 65–75]. And finally, to the extent that State Farm argues that Mr. Seigal does not "address State Farm's consideration of Ms. Pacheco's settling with the tortfeasor for the full liability insurance limits of $100,000" or that he "failed to account for the final evaluation disclosed by State Farm," [Doc. 34 at 10], State Farm's perceived defects in Mr. Seigal's opinion do not render it excludable. "Not every issue raised about an expert's opinion requires the testimony to be excluded," as "many of those concerns can be addressed through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *United States v. Foust*, 989 F.3d 842, 847 (10th Cir. 2021) (cleaned up). To the extent State

Farm believe Mr. Seigal's opinion fails to account for all relevant considerations, they may explore this position on cross-examination.   The Court will not exclude this opinion.

## III.   Legal Opinions

Next, State Farm moves to preclude Mr. Seigal from offering opinions about legal standards or stating legal conclusions.   [Doc. 34 at 10–13].   It claims that Mr. Seigal's opinions improperly "refer to the facts of the case in legal terms" and improperly instruct the jury on the verdict it should reach.   [*Id.* at 12 (quotation omitted)].   It highlights four such opinions from the expert report:

- "[State Farm's] behavior constitutes bad faith and an unreasonable denial of and delay of benefits which initiated pre-suit and has continued post-suit."   [*Id.* at 13 (quoting [Doc. 34-2 at 64])].

- "[State Farm], through their actions and inactions, unreasonably delayed, denied and/or failed to consider the full extent of Ms. Pacheco's damages that were caused by the crash on March 15, 2017."   [*Id.* (quoting [Doc. 34-2 at 65])].

- "[State Farm's] unreasonable actions and inactions resulted in a claim process that delayed the investigation and resulted in the denial of Ms. Pacheco's UIM and Medical Payment claims."   [*Id.* (quoting [Doc. 34-2 at 65])].

- "[State Farm's] investigation and claim handling practices have been unreasonable in nature. [State Farm's] claims practices in Ms. Pacheco's claim lack the good faith practices typically embraced in the insurance industry."   [*Id.* (quoting [Doc. 34-2 at 68])].

State Farm argues that these opinions "impermissibly usurp[] the power of the jury."   [*Id.*].

Ms. Pacheco responds that Mr. Seigal's opinions will assist the jury in understanding what reasonable claims handling practices require, and that "[t]he rules of evidence allow Mr. Seigal to offer opinions based on his experience as to whether State Farm's conduct was reasonable under the circumstances and whether State Farm acted in bad faith."   [Doc. 36 at 11–12].

"An expert's opinion is not inadmissible simply because it embraces an ultimate issue to be determined by the trier of fact." *O'Sullivan*, 233 F. Supp. 3d at 928. "A witness may refer to the law in expressing an opinion," and an expert's opinion may "aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988). However, it is well-established that an expert may not "state legal conclusions drawn by applying the law to the facts," *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991), as "such ultimate conclusions would not be helpful to the jury and would improperly intrude on its fact-finding function," *O'Sullivan*, 233 F. Supp. 3d at 929.

In line with these principles, courts routinely preclude experts from opining about whether an insurer acted reasonably or unreasonably in the handling of an insured's claim. *See, e.g., id.* (excluding opinion "that Geico's conduct was unreasonable or insufficient as a matter of law"); *Bethel v. Berkshire Hathaway Homestate Ins. Co.*, 596 F. Supp. 3d 1260, 1269 (D. Colo. 2022) ("Mr. Sands may not opine as to whether Berkshire's conduct was reasonable as a matter of law because that is a decision that falls within the province of the jury."); *Masters v. Safeco Ins. Co. of Am.*, No. 20-cv-00631-PAB-NRN, 2021 WL 4317112, at *10 (D. Colo. Sept. 23, 2021) (excluding opinion that the "defendant's conduct was unreasonable" as an improper legal conclusion). Similarly, an expert cannot opine about what an insurance company was or was not legally obligated to do, i.e., "define the legal parameters within which the jury must exercise its fact-finding function." *Specht*, 853 F.2d at 809–10; *see also TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1184 (D. Colo. 2018) (excluding opinions that

"[did] nothing more than . . . express [the expert's] beliefs as to the legal rights and obligations of the parties").

These well-established principles apply here.  While Mr. Seigal will be permitted to testify about insurance industry standards and explain why he believes State Farm departed from those standards, *O'Sullivan*, 233 F. Supp. 3d at 929, he is not permitted to opine about whether State Farm acted reasonably, whether State Farm acted in bad faith, what State Farm was or was not legally obligated to do, or whether State Farm complied with its legal obligations, and the Court **EXCLUDES** all such opinions.

## IV.  Medical Payment Coverage Opinions

Finally, Defendant moves to exclude Mr. Seigal's opinion that State Farm failed to comply with industry standards when it failed to tender medical payments ("MP") coverage benefits to Plaintiff and any related discussion of MP coverage.  [Doc. 34 at 13–15].

Though no Party provides a copy of the insurance policy in conjunction with this Motion, it has been filed elsewhere on the docket.  For contextual purposes only, the Court notes that the policy provides, in a section titled "MEDICAL PAYMENTS COVERAGE," that State Farm will pay "medical expenses incurred because of bodily injury that is sustained by an insured and caused by a motor vehicle accident" if (1) the insured "is first provided medical services within one year immediately following the date of the accident," and (2) "such medical expenses are for medical services that are provided within three years immediately following the date of the accent."  [Doc. 52-20 at 14–15].  Throughout his report, Mr. Seigal discusses a "Medical Payment Claim" and

opines about State Farm's handling of that purported claim.  *See, e.g.*, [Doc. 34-2 at 26, 37, 64–65, 72–73].

State Farm moves to exclude all of Mr. Seigal's opinions about MP coverage on the basis that they are irrelevant to this case.  [Doc. 34 at 13–15].  Specifically, State Farm contends that Plaintiff's Complaint asserts claims based on UIM coverage only, not MP coverage.  [*Id.* at 14].  It argues that "the Court should not allow Plaintiff to introduce claims via expert testimony that have never been alleged in the Complaint."  [*Id.* at 15]. Ms. Pacheco responds that Rule 8 does not require her "to plead in her Complaint every instance of bad behavior in order to prosecute her claims" and that she is "entitled to show the jury every contract breach, every unreasonable action, and every bad faith action taken by State Farm."  [Doc. 36 at 15].  She contends that Mr. Seigal's testimony concerning MP coverage "is appropriate and admissible."  [*Id.*].

Ms. Pacheco is correct that Rule 8 generally only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and "a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover," *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir. 1991).  However, "[a]lthough the plaintiff need not plead every relevant fact supporting [her] legal theory, [her] pleading must be sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests' to prevent prejudice to the defendant."  *Simantob v. Mullican Flooring, L.P.*, 527 F. App'x 799, 807 (10th Cir. 2013) (quoting *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) (alteration in original)).  A plaintiff cannot "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  *Evans*, 936 F.2d at 1091.  The

more a case progresses, the more it is likely that "reading a complaint . . . expansively could create injustice" to the opposing party.  *Zokari*, 561 F.3d at 1085.

Ms. Pacheco is represented by counsel and is thus not entitled to a liberal construction of her filings.  *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007).  But even viewing the Complaint in the broadest light possible, the Court cannot glean any cause of action based on the MP provision or the failure to pay MP benefits.  The Complaint is centered on Plaintiff's claim for UIM benefits, alleging that (1) the policy "provid[es] for up to $100,00 in underinsured motorist bodily injury benefits," [Doc. 5 at ¶ 26]; (2) Plaintiff "sent State Farm a demand for the limits provided by the Policy because" her damages "equaled or exceeded $200,000, the amount of the settlement with [the tortfeasor] and the limits of Ms. Pacheco's underinsured motorist benefits under the Policy," [*id.* at ¶ 30]; and (3) State Farm "has not paid Ms. Pacheco any underinsured motorist benefits," [*id.* at ¶ 58].  Plaintiff's substantive claims also focus on UIM benefits; her breach of contract claim alleges that "State Farm breached its contractual duties to fairly and impartially Ms. Pacheco's [sic] claim for underinsured motorist benefits" and that Plaintiff "incurred damages, including the remainder of the underinsured motorist benefit limit to which she is entitled under the policy, as well as interest and costs."  [*Id.* at ¶¶ 63, 67].  Her statutory bad faith claim similarly is limited to State Farm's failure to pay UIM benefits.  *See* [*id.* at ¶ 79 ("State Farm unreasonably denied payment of the underinsured motorist benefit policy limit.")]; *see also* [*id.* at ¶¶ 80–82].

Conversely, the Complaint does not allege that Plaintiff submitted a claim to State Farm based on the policy's MP provision, that State Farm denied or delayed payment of MP benefits, or that State Farm breached the insurance policy by failing to pay Ms.

Pacheco MP benefits.  In fact, the Complaint does not mention MP benefits or any related policy provision at all.  *See generally* [*id.*].  The Court cannot conclude that the Complaint provides State Farm fair notice that any of Plaintiff's claims are based on the failure to pay MP benefits, *Simantob*, 527 F. App'x at 807, and the Court does not construe the Complaint as encompassing any such claims or theory.

Just as a plaintiff cannot amend her complaint by introducing new allegations or theories in a response to a motion to dismiss, *see Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015), a plaintiff cannot amend her pleading by introducing new theories in an expert report.  Plaintiff can only amend her pleading to assert any claims based on MP benefits by filing a motion to amend that meets the requirements of Rules 15 and 16 of the Federal Rules of Civil Procedure.

In sum, the Court does not construe the Complaint as asserting any claim alleging a breach of contract or bad faith related to the MP benefits.  As a result, Mr. Seigal's testimony concerning any MP claim or MP benefits would not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Civ. P. 702(a).  Accordingly, the Court **EXCLUDES** any testimony from Mr. Seigal about MP benefits or any purported MP claim.

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Defendant's Opposed Fed. R. Evid. 702 Motion to Exclude Opinions of Plaintiff's Retained Expert Brian Seigal [Doc. 34] is **GRANTED in part** and **DENIED in part**, as set forth in this Order.

DATED:  August 15, 2024                         BY THE COURT:

                                                _____
                                                Nina Y. Wang
                                                United States District Judge